Deed Book 13805 Pg 1837

*Return To*

Deed Book 13805 Pg 1836
Filed and Recorded Jul-29-2003 01:23pm
2003-0181868
Georgia Intangible Tax Paid $420.00

AMERICAN GENERAL FINANCE, INC.
1690 POWDER SPRINGS RD SW STE 212
MARIETTA  GA 30064-4867

*Jay C. Stephenson*

Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.

EXHIBIT "A"

---

(Space Above This Line For Recording Data)

NOTICE:  THIS DEED SECURES A REVOLVING LOAN AGREEMENT WHICH PROVIDES FOR FUTURE ADVANCES FROM TIME TO TIME.

# DEED TO SECURE DEBT

(With Power of Sale)

THIS  DEED  TO  SECURE  DEBT  ("Security Instrument") is given on  07/25/03                    . The grantor is
DENISE L SERKEDAKIS AND WILLIAM C SERKEDAKIS                                    ("Borrower").

This Security Instrument is given to  AMERICAN GENERAL FINANCIAL SERVICES, INC. (DE)
                                                ,the grantee, which is organized and existing under the laws of
DELAWARE                        , and whose address is  1690 POWDER SPRINGS RD SW
MARIETTA, GA 30064-4867                  ("Lender").
Borrower  may  incur  indebtedness  to  Lender  in  amounts  fluctuating  from  time  to  time  up  to  the  principal  sum  of
ONE HUNDRED FORTY THOUSAND DOLLARS AND ZERO CENTS
                                              (U. S. $    140000.00  ), which amount constitutes the maximum
amount of unpaid loan indebtedness, exclusive of interest, thereon, which is secured under this Security Instrument. This debt is
evidenced by Borrower's Revolving Line of Credit Agreement and Disclosure Statement dated the same date as this Security Instrument
("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable as provided in the Note. This
Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions
and modifications; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security
Instrument, bargain, sell, alien; (c) the performance of Borrower's covenants and agreements under this Security Instrument and the
Note; and (d) the unpaid balances of loan advances made after this Security Instrument is delivered to the recorder for record.  For this
purpose, Borrower does hereby grant, bargain, sell, alien and convey to Lender, with Power of Sale, the following described property
located in  COBB                        County, Georgia:

SEE EXHIBIT "A"

THE MATURITY DATE OF THIS LOAN WILL EXCEED 36 MONTHS BUT WILL NOT EXCEED 50 YEARS

Prior Instrument Reference: Deed Book _____, Page_____;

Page 1 of 4

Deed Book 13805 Pg 1836
Filed and Recorded Jul-23-2003 01:32pa
2003-0181868
Georgia Intangible Tax Paid $406.00

Deed Book 13805 Pg 1837

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the state hereby conveyed and has the right to grant, bargain, sell, alien and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Funds for Taxes and Insurance.** At the request of Lender, Borrower shall begin making monthly payments into an escrow account for the payment of yearly taxes, insurance and other yearly charges imposed upon the Property.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied as provided in the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner prescribed by Lender and on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless the Note provides otherwise, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 18 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. **Preservation and Maintenance of Property; Leaseholds.** Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

7. **Protection of Lender's Rights in the Property; Mortgage Insurance.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Borrower specifically agrees that this Security Instrument secures advances to pay taxes, to pay insurance premiums, to repair, maintain or preserve the Property or to complete improvements on the Property, regardless of whether such advances are made by the original Lender or whether the Property is still owned by the original Borrower. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the insurance in effect until such time as the requirement for the insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Page 2 of 4



Deed Book 13805 Pg 1838

**8. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fractions: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. Unless the Note provides otherwise, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**12. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.

**13. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**14. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**15. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**16. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised if the exercise of this option by Lender is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**17. Borrower's Right to Reinstate.** To the extent required by applicable law, Borrower may have the right to have enforcement of this Security Instrument discontinued. Upon reinstatement by Borrower, this Security Instrument and the obligations secured thereby shall remain fully effective as if no acceleration had occurred.

**18. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 16 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by applicable law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 18, including, but not limited to, reasonable attorney's fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale to Borrower in the manner provided in paragraph 13 and shall give notice of sale by public advertisement for the time and in the manner prescribed by applicable law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facia evidence of the truth of the statements made therein. Borrower covenants and agrees that lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorney's fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by law.

If the Property is sold pursuant to this paragraph 18 Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or each person shall be a tenant holding over and may be dispossessed in accordance with applicable law.

**19. Lender in Possession; Assignment of Rents.** Upon acceleration under paragraph 18 or abandonment of the Property, Lender (by judicially appointed receiver) shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Any rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds, reasonable attorney's fees if and as permitted by applicable law, and then to the sums secured by this Security Instrument. Nothing herein contained shall be construed as constituting Lender a "grantee" in possession, unless Lender shall have entered into and shall remain in actual possession of the Property.

**20. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument, Borrower shall pay any recordation costs but shall not be required to pay any other charges.

**21. Advances to Protect Security.** This Security Instrument shall secure the unpaid balance of advances made by Lender, with respect to the Property, for the payment of taxes, assessments, insurance premiums and costs incurred for the protection of the Property.

**22. Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

**23. Assumption not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

**24. Waiver of Homestead.** Borrower expressly waives and releases all rights of homestead exemption in the property.

Signed, sealed and delivered in the presence of:

_____     _Denise L. Serkedak_____ (Seal)
                                     Borrower DENISE L SERKEDAKIS

_____     _William C. Serkedaki_____ (Seal)
                                     Borrower WILLIAM C SERKEDAKIS

STATE OF GEORGIA, COUNTY OF COBB _____ ss:

I, SAM L. FARRELL _____, a Notary Public in and for said County and State, do certify that DENISE L SERKEDAKIS AND WILLIAM C SERKEDAKIS _____, who is personally to me known, this day appeared before me personally and did acknowledge that THEY did sign, seal and deliver the foregoing instrument of THEIR own free will and accord, for the purposes therein named and expressed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal, this 25TH day of JULY , 2003 .

(SEAL)
My Commission expires: 07/04/06

Notary Public _____

This Instrument prepared by: S. L. FARRELL _____

## EXHIBIT A
## LEGAL DESCRIPTION

Attached to fil███████████

Parcel One:

All that tract or parcel of land lying and being in Land Lot 166 of the 17th District, 2nd Section Cobb County, and being part of Lot 9, Block A, Unit II, Lake Shores Estates Subdivision, as per plat recorded in Plat Book 17, Page 93, Cobb County Records, being more particularly described as follows: Beginning at an iron pin on the Southwest right of way of Lake Shore Drive (50 foot right of way) at the intersection thereof with the common lot line of Lots 9 and 10, said Subdivision, Block and Unit; thence Southeasterly along the Southwest right of way of Lake Shore Drive 105 feet to an iron pin, said point being 5 feet Northwesterly from the Northernmost corner of Lot 10, said Subdivision, Block and Unit; running thence Southwesterly along a line parallel to and 5 feet Northwesterly from the Northwestern line of said Lot 10, a distance of 281.4 feet to an iron pin; thence Northwesterly a distance of 59.8 feet to an iron pine at the Southwest corner of Lot 8 aforesaid; Northeasterly along the Southeast line of said Lot 8, a distance of 278.8 feet to the point of beginning.

Parcel Two:

All that tract or parcel of land lying and being in Land Lot 166 of the 17th District, 2nd Section, Cobb County, Georgia and being more particularly described as follows: In order to arrive at the true point of beginning, begin at a point formed by the intersection of the Southeasterly side of a 30 foot wide reserved access strip and Southwesterly right of way of Lake Shore Drive, said point also being the Northwest corner of Lot 8, Block A, Lake Shores Estates, Unit II, as per plat recorded in Plat Book 17, Page 93, Cobb County Records; running thence Southwesterly along the Southeasterly side of said 30 foot wide reserved access strip with is also the Westerly line of said Lot 8, Block A, a distance of 232.1 feet to a point; running thence Southeasterly along the Southwestern line of said Lot 8, Block A, a distance of 106.4 feet to the true point of beginning, said point also being the most Western corner of Lot 9, Block A, Lake Shores Estates, Unit II; running thence Southwesterly a distance of 42.7 feet to a point; running thence Southeasterly a distance of 54.0 feet to a point; running thence Northeasterly a distance of 48.7 feet to the most Southern corner of said Lot 9, Block A; running thence Northwesterly along the Southwestern line of said Lot 9, Block A, a distance of 59.8 feet to the true point of beginning, as per plat recorded in Plat Book 80, Page 43, Cobb County Records, which plat is hereby referred to and made a part of this description.



Deed Book **13805** Pg **1841**
Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.

STATE OF GEORGIA

COUNTY OF COBB

GRANTOR: DENISE L SERKEDAKIS AND WILLIAM C SERKEDAKIS

LENDER: AMERICAN GENERAL FINANCIAL SERVICES, INC. (DE)

DATE OF SECURITY DEED 07/25/03

## WAIVER OF BORROWER'S RIGHTS

### BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY:

(1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR; (2) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW, TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED BY LAW; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR THIS _25ᵗ__ DAY OF _July_, _2003_

_Denise L. Serkedakis_

_William C Serkedakis_

_____

SIGNED, SEALED AND DELIVERED
IN THE PRESENCE OF:

_____
(WITNESS)

_____
(NOTARY PUBLIC)

My Commission Expires 7/4/06

(Rev. 10-14-01) GA1621

N.P.
SEAL

When Recorded Return To:
Nationstar Mortgage LLC
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683

Loan No ▮▮▮▮▮▮▮
Springleaf Loan No ▮▮▮▮▮▮▮▮▮

## ASSIGNMENT OF SECURITY DEED

**Regarding this instrument, contact Nationstar Mortgage, LLC, 4000 Horizon Way, Irving, TX 75063, telephone # 972-956-6320, which is responsible for receiving payments.**

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **SPRINGLEAF FINANCIAL SERVICES, INC. F/K/A AMERICAN GENERAL FINANCIAL SERVICES, INC., D/B/A AMERICAN GENERAL FINANCIAL SERVICES, INC. (DE), WHOSE ADDRESS IS 601 N.W. SECOND St., EVANSVILLE, IN, 47708, (ASSIGNOR)**, by these presents does convey, grant, assign, transfer and set over the described Security Deed with all interest secured thereby, all liens and any rights due or to become due thereon to **U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE FOR SPRINGLEAF MORTGAGE LOAN TRUST 2013-3, WHOSE ADDRESS IS C/O 4000 HORIZON WAY, IRVING, TX 75063, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Security Deed is executed by **DENISE L. SERKEDAKIS AND WILLIAM C. SERKEDAKIS** to **AMERICAN GENERAL FINANCIAL SERVICES, INC. (DE)** and recorded in Deed **Book 13805, Page 1836 and Doc # 2003-0181868** in the office of the Clerk of the Superior Court of **COBB** County, **Georgia.**

Modification: DATED DATE: 08/30/2012 REC DATE: 09/18/2012 BK 14983 PG 164 INST# D2012-096172.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand on ___/_/__/2015 (MM/DD/YYYY).
**SPRINGLEAF FINANCIAL SERVICES, INC. F/K/A AMERICAN GENERAL FINANCIAL SERVICES, INC., D/B/A AMERICAN GENERAL FINANCIAL SERVICES, INC. (DE)**

By: _____
**Susan Schotsch**
**VICE PRESIDENT**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

_____
Alyssa Williams     Witness

_____
Danielle Burns     Witness

STATE OF FLORIDA    COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on ___/_/__/2015 (MM/DD/YYYY), by Susan Schotsch as VICE PRESIDENT of SPRINGLEAF FINANCIAL SERVICES, INC. F/K/A AMERICAN GENERAL FINANCIAL SERVICES, INC., D/B/A AMERICAN GENERAL FINANCIAL SERVICES, INC. (DE), who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

_____
Nicole Baldwin
Notary Public - State of FLORIDA
Commission expires: 08/05/2016

Nicole Baldwin
Notary Public State of Florida
My Commission # EE 222285
Expires August 5, 2016

Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

**After Recording Return To:**
**NATIONSTAR MORTGAGE LLC**
**8950 CYPRESS WATERS BLVD**
**COPPELL, TX 75019**

**This Document Prepared By:**
*Walter Lee*
**NATIONSTAR MORTGAGE LLC**
**8950 CYPRESS WATERS BLVD**
**COPPELL, TX 75019**

_____ [Space Above This Line For Recording Data] _____

Unpaid Principal Balance: **$142,384.14**                    Loan No.
Original Loan Amount: **$140,000.00**
New Money: **$2,997.77**
**New Loan Amount: $145,381.91**

# HOME AFFORDABLE MODIFICATION AGREEMENT

Borrower ("I"):  **DENISE SERKEDAKIS and WILLIAM SERKEDAKIS.** Dated this *28* day of *August 15*. If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

Lender or Servicer ("Lender"):  **NATIONSTAR MORTGAGE LLC, whose address is 8950 CYPRESS WATERS BLVD, COPPELL, TX 75019**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): *Aug 28*, *15* and recorded in Book/Liber **N/A**, of the Official Records of  County, **GA**.
Property Address ("Property"):  **3629 LAKESHORE DR**
                                            **SMYRNA, GA 30082**

   **Legal Description:**


If my representations and covenants in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement.  This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
8306 01/14                                                                    Form 3157  3/09  (rev. 10/10) *(page 1 of 6 pages)*

1. **My Representations and Covenants**. I certify, represent to Lender, covenant and agree:
   A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or my default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;
   B. One of the borrowers signing this Agreement lives in the Property as a principal residence, and the Property has not been condemned;
   C. There has been no impermissible change in the ownership of the Property since I signed the Loan Documents.  A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;
   D. I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification Program ("Program"));
   E. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;
   F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and
   G. I have made or will make all payments required under a trial period plan.
   H. In the event that I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the loan documents and did not reaffirm the mortgage debt under applicable law, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

2. **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:
   A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and
   B. I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred.  I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3. **The Modification**. If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **October 1, 2015** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a trial period plan, this modification will not take effect.  The first modified payment will be due on **October 1, 2015**.
   A. The Maturity Date will be: **September 1, 2055**.
   B. The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be **$145,381.91** (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this

means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.  Interest at the rate of **3.375%** will begin to accrue on the New Principal Balance as of **September 1, 2015** and the first new monthly payment on the New Principal Balance will be due on **October 1, 2015**. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Prin & Int Payment Amount | Monthly Escrow Payment Amount | Total Monthly Payment | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------|-------------------------------|-----------------------|-------------------|----------------------------|
| 1-40 | 3.375% | September 01, 2015 | $552.35 | $281.38 May adjust periodically | $833.73 May adjust periodically | October 01, 2015 | 480 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest being added to the outstanding principal balance.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F.  I agree to pay in full the Deferred Principal Balance and any other amounts still owed under the Loan Documents by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

4.  **Additional Agreements**. I agree to the following:

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.  That this Agreement shall supersede the terms of any modification, forbearance, trial period plan or other workout plan that I previously entered into with Lender.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. That this Agreement constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my escrow account.

E. That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H. That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I. That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J. That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage Loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K. That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this

Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

L. Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has a mailing address of P.O. Box 2026, Flint, MI 48501-2026, a street address of 1901 E Voorhees Street, Suite C, Danville, IL 61834, and telephone number of (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the trial period plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

N. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

P. This Agreement modifies an obligation secured by an existing security instrument recorded in County, GA, upon which all recordation taxes have been paid. As of the date of this agreement, the unpaid principal balance of the original obligation secured by the existing security instrument is $142,384.14. The principal balance secured by the existing security instrument as a result of this Agreement is $145,381.91, which amount represents the excess of the unpaid principal balance of this original obligation.

In Witness Whereof, the Lender and I have executed this Agreement.

_Denise Serkedakis_ _____ (Seal)

**DENISE SERKEDAKIS** -Borrower

_William C Serkedakis_ _____ (Seal)

**WILLIAM SERKEDAKIS** -Borrower

**NATIONSTAR MORTGAGE LLC**

By: _Walter Lee_ _____ (Seal) - Lender
Name: _Walter Lee_ _____
Title: **Assistant Secretary**

_September 18, 2015_ _____
Date of Lender's Signature

Loan No
Borrower: DENISE SERKEDAKIS and WILLIAM SERKEDAKIS

# AGREEMENT TO MAINTAIN ESCROW ACCOUNT

WHEREAS, DENISE SERKEDAKIS and WILLIAM SERKEDAKIS ("Borrower") desires NATIONSTAR MORTGAGE LLC ("Lender") to collect payments from Borrower to be held by Lender for the payment of certain sums due in connection with Borrower's Note and Security Instrument, dated _8/28/2015_, (hereinafter referred to as "Note" and "Security Instrument" respectively) currently held by Lender;

NOW THEREFORE, in consideration of the foregoing and the mutual covenants contained in this Agreement ("Agreement"), Borrower agrees to pay Lender, on the day Periodic Payments are due under the Note, until the Note is paid in full, or the Escrow Account is otherwise terminated pursuant to this Agreement or in accordance with applicable law, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Security Instrument as a lien or encumbrance on the Property;  (b) leasehold payments or ground rents on the Property, if any;  (c) premiums for any and all insurance required by Lender under the Security Instrument; and (d) Mortgage Insurance Premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums.  These items are called "Escrow Items."  In the event that Borrower receives bills, assessments, invoices, or other requests for payment of Escrow Items, Borrower shall promptly furnish to Lender all such notices.

Borrower shall pay Lender the Funds for Escrow Items unless this Agreement is terminated either by Lender, or pursuant to applicable law.  In the event of termination, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  In the event Borrower is obligated to pay Escrow Items directly, and Borrower fails to pay the amount due for an Escrow Item, Lender may pay such amount in accordance with the terms of the Note and Security Instrument and Borrower shall then be obligated to repay Lender any such amount.  Additionally, if Borrower is obligated to pay Escrow Items directly, and Borrower fails to pay the amount due for an Escrow Item, Lender may, in accordance with applicable law, require Borrower to maintain an Escrow Account.

Borrower agrees to make an initial payment of Funds to establish the escrow account, which amount shall be based on an estimate of the amount and date of expenditures for future Escrow Items, or otherwise in accordance with the Real Estate Settlement Procedures Act ("RESPA").  The estimate of expenditures of future Escrow Items shall be made based on current data available to Lender.  Borrower acknowledges that the actual payments of Escrow Items may vary from the estimated amounts.

Lender will collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time period specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge.  Unless agreed to in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to

AGREEMENT TO ESTABLISH ESCROW ACCOUNT 11/12

*(Page 1 of 2)*

Loan No.
Borrower: DENISE SERKEDAKIS and WILLIAM SERKEDAKIS

Lender the amount necessary to make up the shortage in accordance with RESPA. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument or termination of this Agreement, Lender shall promptly refund to Borrower any Funds held by Lender.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Agreement to Maintain Escrow Account.

_____        8/28/2015
Borrower - DENISE SERKEDAKIS                         Date

_____        8-28-15
Borrower - WILLIAM SERKEDAKIS                        Date

_____        _____
Borrower -                                           Date

_____        _____
Borrower -                                           Date

AGREEMENT TO ESTABLISH ESCROW ACCOUNT 11/12                          *(Page 2 of 2)*

EXHIBIT "B"

AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT

**AMERICAN GENERAL FINANCIAL SERVICES**

| ACCOUNT NUMBER | | | |
|---|---|---|---|
| DATE 07/25/03 | CREDIT LIMIT $ 140000.00 | TYPE OF LOAN (Alpha) X00 |

| LENDER/SECURED PARTY NAME AND ADDRESS ("Lender") | LENDER'S TELEPHONE NUMBER: 770-420-9203 |
|---|---|
| AMERICAN GENERAL FINANCIAL SERVICES, INC. (DE)<br>STE 212<br>1690 POWDER SPRINGS RD SW<br>MARIETTA, GA 30064-4867 | |

| BORROWER(S) NAME AND ADDRESS ("I","We") |
|---|
| DENISE L SERKEDAKIS<br>WILLIAM C SERKEDAKIS<br>3629 LAKESHORE DR<br>SMYRNA, GA 30082 |

| PROPERTY THAT SECURES THIS LINE OF CREDIT | | |
|---|---|---|
| [X] Conventional Home and Real Estate | [ ] Manufactured Home and Real Estate | [ ] Other Real Estate |
| PROPERTY ADDRESS<br>3629 LAKESHORE DR<br>SMYRNA, GA 30082 | PROPERTY ADDRESS | PROPERTY ADDRESS |

**1. Meaning of Some Words.** In this Agreement, the words "Borrower," "I," "me," "my," "we," and "our" mean all persons signing this Agreement as a "Borrower" or "Co-Borrower." The words "Lender," "you," and "your" mean AMERICAN GENERAL FINANCIAL SERVICES, INC. (DE) _____ its successors, and assigns.

**2. Home Equity Line of Credit Agreement.** Lender has opened a Line of Credit for me (my "Account"). This American General Home Equity Line of Credit Agreement ("Agreement") states the terms and conditions of my Account. I have read this Agreement carefully and will keep a copy for my records.

**3. Credit Limit.** The maximum amount of credit available to me under this Agreement is called my Credit Limit. My Credit Limit is stated above. The total amount I owe Lender at any time under this Agreement and my Security Instrument (defined in Section 5 below) is called my Total Balance. The total amount available for me to borrow from my Account at any time is called my Available Credit. My Available Credit equals my Credit Limit, less my outstanding Principal Balance. My Principal Balance is the amount I owe Lender for each Draw (defined in Section 7 below) on my Account, as well as any fees and charges that are added to my Principal Balance and any credit insurance premiums.

**4. Promise to Pay.** I promise to pay to the order of Lender my Total Balance. If more than one Borrower signs this Agreement, all of us are bound by this Agreement, and each of us, together and individually, will keep all of the promises we make in this Agreement, including our Promise to Pay. If someone other than a Borrower uses my Account, I promise to pay amounts owed to Lender because of Draws by that person, even if that person did not have my permission and even if I told Lender that the person was using my Account, to the extent permitted by applicable law.

**5. Security Interest.** At the time I sign this Agreement, I also will give Lender a mortgage, deed of trust, and/or other security instrument (the "Security Instrument"). The Security Instrument gives Lender a security interest in the property (the "Security Interest") described at the beginning of this Agreement (the "Property"). Lender's Security Interest will be limited to my Credit Limit plus any unpaid finance charges. The Property will be used as the principal residence of at least one Borrower, unless Lender otherwise agrees. I agree not to allow any other lien to be filed against the Property that will be superior to or adversely affect Lender's Security Interest.

The Security Instrument will not secure other debts I owe Lender, unless it specifically states that it secures those debts. This Agreement and my Account will not be secured by a mortgage, deed of trust, or other security instrument on anyone's principal residence, unless the mortgage, deed of trust, or other security agreement specifically states that it secures this Agreement.

**6. Using My Account.**

**Right to Cancel.** If the Property is the principal residence of any Borrower, I may be entitled to cancel all or a part of this Agreement under the Truth in Lending Act and Regulation Z or other applicable law. If Lender gives me a Right to Cancel, I may not use my Account until the Right to Cancel expires. I may also be entitled to rescind a Security Interest added or increased in the event that the Credit Limit on my Account is increased.

**The Term of This Agreement.** The term of this Agreement is divided into two periods: the _10_ year "Draw Period" and the "Repayment Period." The Repayment Period will vary depending on the payment option I choose.

**Draw Period.** An advance of funds from my Account is called a Draw. This Agreement and the Draw Period begin on _07/25/03_. The Draw Period will continue for _10_ years and will end on _07/24/13_ (the "Last Draw Date").

**Repayment Period.** After the Draw Period ends, the Repayment Period begins ("Repayment Period"). During the Repayment Period, I may not take any Draws, and I must repay the Total Balance in accordance with the payment option I choose.

**Credit Limit.** I may make Draws on my Account up to my Credit Limit; however, I may not take a Draw greater than my Available Credit. If I do request a Draw greater than my Available Credit in violation of this Agreement, Lender may but is not obligated to honor that Draw request, and Lender is not obligated to honor future Draw requests in excess of my Credit Limit.

**7. Draws.** There are two kinds of Draws: the "First Draw" and "Subsequent Draws."

**First Draw.** I must take a First Draw in the minimum amount of $___3001.00_ on _07/30/03_ (the "First Draw Date"). My First Draw will be paid to me by check. In addition to my First Draw, any Fees due under this Agreement that I choose to finance will be added to my Principal Balance.

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

UNXA51 (7-13-03) HELOC Agreement (1-2)    Page 1    Borrower's Initials

### AMERICAN GENERAL HOME EQUITY / LINE OF CREDIT AGREEMENT (con't)

**Subsequent Draws.** I may take Subsequent Draws during the Draw Period by writing special checks from time to time (each, a "Check"), but I may not request a Subsequent Draw for an amount greater than my Available Credit. Each Subsequent Draw must be for at least $ ___100.00___. Immediately after any Subsequent Draw, my Principal Balance must exceed $ _N/A___. I may obtain Subsequent Draws at Lender's offices or by using my Checks I receive from Lender. Lender may charge amounts to my Account as Subsequent Draws to protect Lender's Security Interest in the Property, as stated in the Security Instrument, at any time.

**Checks.** I can use my Checks, subject to the terms of this Agreement. When Lender honors a Check, Lender may charge the amount of the Check to my Account, even if it is post-dated, stale, or will cause me to exceed my Credit Limit. Lender is not obligated to pay Checks that will cause me to exceed my Credit Limit, but, if Lender does so, Lender is not obligated to do so again in the future. Checks will not be returned with my Monthly Statements. Lender can pay Checks in any order it chooses even though this may affect whether I exceed my Credit Limit, unless otherwise required by law.

**Stop Payment Requests.** If I ask, Lender may attempt to stop payment on a Check, but Lender will have no liability to me if Lender does not. An oral request to stop payment is good for only fourteen (14) calendar days unless I confirm it in writing within that period. A written request is good for only six (6) months unless I renew it in writing within that period. I will contact Lender immediately if I wish to stop payment on a Check. Lender then will send me a "Stop Payment Request" form that I must sign and return to Lender. Lender will advise me of other rules that will apply to Stop Payment Requests.

**Loss of Checks.** I must notify Lender immediately if any of my Checks are lost or stolen or if I learn that any of the Checks have been used without my permission. To report the loss or theft of my Checks, I may write to Lender at the address listed at the beginning of this Agreement or on my Monthly Statement ("Lender's Address") or call Lender at the telephone number listed at the beginning of this Agreement or on my Monthly Statement ("Lender's Telephone Number"). Lender may change Lender's Address or Lender's Telephone Number by telling me in my Monthly Statement. If my Account is closed for any reason, I agree to return all unused Checks to Lender immediately.

**Restrictions on Draws.** Lender may refuse to honor any Draw request:
(a)   that will cause me to exceed my Credit Limit;
(b)   that I try to use to make any payments on my Account or any other account due to Lender, unless I first get Lender's permission in writing;
(c)   that does not comply with this Agreement;
(d)   if Lender has suspended or terminated my Account; or
(e)   if I am otherwise in default of this Agreement.

Lender is not responsible if I am dissatisfied with the goods or services I have purchased or leased with Draws from my Account or if anyone does not accept my Check.

**8. How My Finance Charges Are Computed.** Finance charges will be assessed on my Account in the form of Additional Fees described in Section 10 below and by applying the applicable daily periodic rate disclosed in Section 9 below to the average daily balance on my Account and then multiplying the resulting product by the number of days in the billing cycle. The Finance Charge calculated in this manner will never exceed the Finance Charge that would result from applying the daily periodic rate to the daily balance for each day of the billing cycle. Finance charges will be disclosed on my Monthly Statement as the Finance Charge. The daily periodic rate applied to my Account will be determined by dividing the annual percentage rate applicable to my Account (the "Annual Percentage Rate") for the billing cycle by 365 (the "Daily Periodic Rate").

**Calculation of Average Daily Balance.** Lender figures a portion of the Finance Charge on my Account by applying the Daily Periodic Rate to the average daily balance on my Account. To get the average daily balance, Lender takes the beginning Principal Balance (which excludes any accrued and unpaid finance charges resulting from the daily periodic rate) on my Account each day, adds any new Draws, Fees (as defined below), and credit insurance premiums (except as otherwise provided in this Agreement), and subtracts any payments or credits. This gives Lender the "Closing Daily Balance" on my Account. Then, Lender adds all the Closing Daily Balances for the billing cycle and divides the total by the number of days in the billing cycle. This gives Lender the "Average Daily Balance." The Closing Daily Balance will reflect payments, credits, draws, and debits posted to my Account each day but will not include any unpaid finance charges resulting from the daily periodic rate.

**No Grace Period.** There is no grace period during which I can make a payment and avoid a Finance Charge. Finance charges will begin to accrue on the day that Draws, Fees (as defined below), or credit insurance premiums are posted to my Account.

**9. Annual Percentage Rates/Daily Periodic Rates.** The interest rate that Lender uses to calculate a portion of the Finance Charge on my Account is called an Annual Percentage Rate or a Daily Periodic Rate. The Annual Percentage Rate is the Daily Periodic Rate of interest on my Account expressed as an annual rate.

☐ **Fixed Annual Percentage Rate/Daily Periodic Rate.** The ANNUAL PERCENTAGE RATE applied to my Account is _N/A___ %. The Daily Periodic Rate applied to my Account is _N/A___ %.

☒ **Variable Annual Percentage Rate/Daily Periodic Rate.** My Annual Percentage Rate and Daily Periodic Rate may change _quarterly___. The Annual Percentage Rate and the Daily Periodic Rate on my Account are based on an index. The index is the highest Prime Rate in the "Money Rates" listing in The Wall Street Journal on the first business day after the 14th day of the month preceding each _quarterly___ anniversary of my Account. The anniversary of my Account is _three (3) months__ from the Date of Agreement above and the same date of each _quarterly___ time period thereafter (my "Anniversary"). To get my Annual Percentage Rate, Lender adds _3.500_ percentage point(s) (the "Margin") to the index. My initial **ANNUAL PERCENTAGE RATE** is _7.750_%, and my initial Daily Periodic Rate is _.0212_%. If the index becomes unavailable during the term of this Agreement, Lender may use a comparable index after Lender notifies me.

**Rate Changes.** The Annual Percentage Rate can change _quarterly___, but the rate cannot increase or decrease by more than _1.000_ percentage point(s) at any rate change. Changes in the Annual Percentage Rate and Daily Periodic Rate for my Account will take effect on the first day of the billing cycle beginning on or after the Anniversary of my Account. My Monthly Statement will show the Annual Percentage Rate and Daily Periodic Rate that applied to my Account during the billing cycle. Increases in the Annual Percentage Rate and Daily Periodic Rate for my Account may result in a greater Finance Charge and an increase in the Current Payment I must make on my Account. The **ANNUAL PERCENTAGE RATE** on my Account will never be more than _15.000_%, which is the same as a Daily Periodic Rate of _.0411_%, or be less than _6.500_%, which is the same as a Daily Periodic Rate of _.0178_%.

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT

☐ **Introductory Discount for Annual Percentage Rate/Daily Periodic Rate.** Initially, during the discount period, the Annual Percentage Rate and Daily Periodic Rate applicable to my Account will not be the Annual Percentage Rate and Daily Periodic Rate shown above. The Introductory **ANNUAL PERCENTAGE RATE** is N/A %, and the Introductory Daily Periodic Rate is N/A %. The Introductory Annual Percentage Rate and Daily Periodic Rate applicable to my Account will be in effect from the First Draw Date through the first NA billing cycles. Thereafter, beginning on the first day of the next billing cycle, the Annual Percentage Rate and Daily Periodic Rates shown above will apply.

**Each Annual Percentage Rate disclosed above includes only interest and not other charges.**

**10. Fees.** I agree to pay certain fees and charges ("Fees") as provided below. I agree that Lender may charge these Fees to my Account and include these Fees in my Principal Balance, except as otherwise provided in this Agreement. Fees will not be refunded if my Account is closed for any reason, unless required by law.

**Loan Fees.** I agree to pay the following Loan Fees in connection with my Account. If I do not pay the Loan Fees in cash when I open my Account, funds may be advanced from my Account to pay these Loan Fees at the time I take my First Draw.

    **Loan Fees Paid to Lender.**


    **Loan Fees Paid to Third Parties.**
| | | |
|---|---|---|
| $ | 295.00 | Title Insurance Fee |
| $ | 160.00 | Title Examination Fee |
| $ | 20.00 | Recording/Releasing Fees RE |
| $ | 418.50 | Intangible Tax |
| $ | 6.50 | GA Residential Mtg. Loan Fee |

**Additional Fees.** I also agree to pay the following Additional Fees on my Account. These Fees are an additional kind of FINANCE CHARGE. These Additional Fees will appear on my first Monthly Statement in the "FINANCE CHARGE" box.

    **Additional Fees Paid to Lender.**
    $ 1150.00 Points

    **Additional Fees Paid to Third Parties.**


**Account Fees.** If checked, Lender may charge the following Fees to my Account:

☐ **Initial Annual Fee.** Lender may charge an Annual Fee on my Account on my first Monthly Statement. The initial Annual Fee is $ N/A .

☐ **Subsequent Annual Fee.** Lender may charge a subsequent Annual Fee on my Account on each annual Anniversary during my Draw Period. The subsequent Annual Fee is $ N/A .

☒ **Late Fee.** I may have to pay a Late Fee as more fully described in Section 34.

☒ **Returned Check Fee.** I may be required to pay a Returned Check Fee as more fully described in Section 35.

☐ **Reconveyance Fee.** I may be required to pay a Reconveyance Fee as more fully described in Section 36.

**11. Payment Options.** Each month I must pay at least the Minimum Payment shown on each of my Monthly Statements by the payment due date. I may make larger payments on my Account at any time and in any amount, but I still must make my Minimum Payment due for the month(s) following that larger payment. The larger my payments, the smaller the total Finance Charge I will have to pay over the term of this Agreement. I may pay the Total Balance on my Account in full at any time; however, I may be required to pay a Prepayment/Termination Fee, as provided in Section 33.

☐ **Percent of New Balance Option.** Under this option and subject to any balloon payment below, my Minimum Payments will be due monthly and will include any Past Due Amounts and any Late Fee and any Returned Check Fees assessed for the billing cycle, plus a Current Payment equal to N/A % of the sum of the Principal Balance, the finance charges, and any credit insurance premiums assessed for the current billing cycle.

☒ **Assumed Term Option.** Under this option and subject to any balloon payment below, my Minimum Payment will be due monthly and will include a Current Payment equal to an amount that would amortize the Principal Balance and the Finance Charge to be earned on my Principal Balance over an assumed term of 30 years (the "Assumed Term") in substantially equal amounts each billing cycle, plus any Past Due Amounts and any credit insurance premiums, any Late Fee, and any Returned Check Fees assessed for the billing cycle. During my Draw Period, if my Principal Balance changes because I take a Draw and/or Fees are charged to my Account or if my Annual Percentage Rate changes (other than an adjustment resulting from the expiration of an Introductory Rate), my Current Payment will be adjusted at the end of the billing cycle in which the change occurs to an amount that would amortize my Principal Balance and the Finance Charge to be earned on my Principal Balance in substantially equal amounts each billing cycle over my Assumed Term; however, the due date of any balloon payment below will remain the same. During the Repayment Period, each time my Annual Percentage Rate is adjusted or an advance is made from my Account pursuant to this Agreement, my Current Payment will also be adjusted to an amount that would amortize my Principal Balance and the Finance Charge to be earned over the remainder of my Assumed Term; however, the due date of any balloon payment below will remain the same.

If the Current Payment determined under either payment option above is less than $ 50.00 , my Current Payment will equal $ 50.00 or the New Balance shown on my Monthly Statement, whichever is less.

☐ **Balloon Payment.** If I only make the required Current Payments on my Account, they will not be sufficient to repay my Total Balance. I will then be required to pay my remaining Total Balance in a single "Balloon Payment" on N/A .

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT (con't)

**Allocation of Payments.** Account payments will be applied first to any Late Fee, then to any Returned Check Fee, any credit insurance premiums billed (where applicable), then to finance charges assessed on my Account, and finally to the Principal Balance of my Account, unless otherwise required by law.

**Form of Payments.** I must make my payments by check, money order, or similar instrument payable in U.S. funds and drawn on a financial institution located in the U.S. I may not mail Lender cash or use a Check (see Section 7 above) to pay Lender; however, I may make my payments in cash in person at any of Lender's offices. I agree not to send Lender payments marked "paid in full," "without recourse," or similar language unless those payments are marked for special handling and sent to Lender's office servicing my Account.

**Where to Send My Payments.** I must send my payment to Lender's Address listed on my Monthly Statement. Payments that Lender receives at Lender's Address by 3 PM each business day will be credited to my Account as of the date of receipt. Payments that Lender receives at Lender's Address after this time will be treated as received by Lender on the next business day. Payments received at any other location will be credited no later than five (5) days after Lender receives them to be credited. I will be sure to include my payment coupon with my payment. If I fail to include my payment coupon, my payment may not be credited to my Account for up to five (5) days. Delayed crediting may cause me to incur a Late Fee and/or additional finance charges.

**12. Monthly Statements.** Lender will bill me for payments due on my Account, every month, by sending me a billing statement, called a Monthly Statement. The period of time covered by each Monthly Statement is called a "Billing Cycle." My first Billing Cycle begins on the Date of this Agreement. The last day of each Billing Cycle is called the "Billing Cycle Closing Date." Each Monthly Statement will show the activity on my Account during the Billing Cycle. The day of the month when each payment will be due is shown after the words "Payment must be received on or before" (the "Payment Due Date"). Each Monthly Statement will show the Billing Cycle Closing Date, the Payment Due Date for the Billing Cycle, and certain other required information. Lender will send each Monthly Statement to the Borrower's address listed at the top of page 1 of this Agreement, called "Borrower's Address."

**When Lender Will Send My Monthly Statements.** Lender will send me a Monthly Statement for each Billing Cycle in which (1) Lender charges a Finance Charge, (2) Lender charges a Fee, (3) there is any other activity on my Account, or (4) the law requires that Lender send me a Monthly Statement.

**Billing Errors.** I should review each Monthly Statement carefully and advise Lender in writing of any errors within sixty (60) days of the Billing Cycle Closing Date, as more fully explained on the Billing Rights Statement that accompanies this Agreement.

**13. When Lender May Prohibit Subsequent Draws or Reduce My Credit Limit.** To the extent permitted by applicable law and as provided in the Agreement, Lender may prohibit Subsequent Draws or reduce my Credit Limit if:

   (a) The value of the Property decreases significantly below the appraised value of the Property. The appraised value of the Property is the value shown by Lender's most recent appraisal of the Property (the "Appraised Value"); or

   (b) Lender reasonably believes that I will be unable to make my Minimum Payments on time because of a material adverse change in my financial circumstances; or

   (c) I am in default of a material obligation under this Agreement. A material obligation includes, but is not limited to, my promise (i) to notify Lender immediately should there be an adverse change in my credit or financial condition; (ii) to give Lender updated financial or credit information upon request; (iii) not to permit any lien to be filed against the Property that will be superior to Lender's Security Interest; and (iv) not to exceed my Credit Limit; or

   (d) Government action (i) prevents Lender from charging any Annual Percentage Rate provided under this Agreement or (ii) adversely affects the priority of Lender's Security Interest in the Property to the extent that the value of Lender's Security interest is less than 120% of my Credit Limit; or

   (e) When the maximum Annual Percentage Rate under this Agreement is reached; or

   (f) Lenders regulators consider Subsequent Draws to be an unsafe and unsound lending practice; or

   (g) I ask Lender to reduce or limit my Subsequent Draws; or

   (h) Any event listed in Section 15 below occurs.

**How to Reinstate My Account.** Lender will reinstate my Account during the Draw Period if (1) I ask Lender in writing to reinstate, (2) I pay any credit report fees and any appraisal fee Lender incurs to update Lender's credit information about me, (3) Lender agrees that the reason that caused Lender to prohibit Subsequent Draws or reduce the Credit Limit no longer exists, and (4) there is no other reason for Lender to prohibit Subsequent Draws or reduce my Credit Limit. Lender may require that all Borrowers sign any request to reinstate.

**14. Required Property Insurance.** I am required to maintain hazard insurance on the Property in types and amounts acceptable to Lender ("Required Insurance"). I have the option of providing the Required Insurance through an existing policy of insurance owned or controlled by me, or through a policy to be obtained and paid for by me. I may purchase this Required Insurance through any insurer, insurance agent, or broker of my choice that is acceptable to Lender. Lender may for reasonable cause decline any insurance provided by me. Required Insurance is not available for purchase through Lender. Required Insurance must (a) insure the Property against all risks of physical damage, including loss by fire and other hazards for the term of the Agreement, (b) have terms and amounts satisfactory to Lender, (c) name Lender as loss payee or mortgagee, (d) not permit the addition of any other loss payee or mortgagee to the insurance policy unless Lender consents in writing, (e) provide that such insurance will not be canceled or modified without at least fifteen (15) days prior written notice to the loss payee or mortgagee, and (f) not include any disclaimer of the insurer's liability for failure to give such notice. I agree to provide Lender with satisfactory proof of my Required Insurance.

I agree to keep my Required Insurance in force until all amounts that I owe Lender under this Agreement and the Security Instrument are paid in full, my Account is terminated, and Lender releases or discharges the Security Instrument. In case of damage to or loss of the Property, I agree to give prompt notice to Lender and the insurance carrier. If I fail to promptly notify or make proof of loss to the insurance carrier, Lender may (but is not required to) do so on my behalf. I agree that Lender may use any insurance proceeds to reduce the amounts that I owe under this Agreement and the Security Instrument. I authorize Lender to adjust my losses and sign my name to any check, draft, or other papers necessary to obtain such insurance payments. If insurance proceeds paid to Lender do not satisfy all amounts that I owe Lender under this Agreement and the Security Instrument, I remain responsible for payment of the balance of any amounts due under this Agreement and the Security Instrument.

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**



## AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT

If, at any time, I fail to buy or keep in force my Required Insurance, Lender may (but is not required to) purchase insurance at my expense to protect Lender's interest in the Property. I agree that Lender may, at its sole option, cancel this insurance and that Lender has a security interest in any unearned premiums from such insurance and I hereby assign to Lender any rights I may have to said unearned premiums and I authorize and appoint Lender as my attorney-in-fact to cancel the insurance and apply the unearned premiums to reduce my Account upon cancellation of said insurance. I agree that this insurance may, but need not, protect my interests. The coverage purchased by Lender may not pay any claim I make. I agree that the cost of insurance purchased by Lender may be much more than the cost of insurance I could have obtained on my own, and I agree that the cost of such insurance may, to the extent permitted by law, be added to my Principal Balance and accrue finance charges. I authorize Lender to purchase the insurance required by this Agreement. I understand that Lender or its affiliate may earn a profit from the purchase of this insurance, to the extent permitted by applicable law.

**15. Default.** To the extent permitted by applicable law, I will be in default of this Agreement if

(a) I file for, or my creditors place me in, bankruptcy and I fail to meet the repayment terms of this Agreement; or

(b) I do not make any Minimum Payment by the Payment Due Date or otherwise fail to meet the repayment terms provided for in this Agreement; or

(c) I commit fraud or materially misrepresent any information with regard to my Account, including, but not limited to, material misrepresentations in my credit application, financial statements that I make to Lender, or any correspondence or discussions that I have with Lender about my Account; or

(d) Any action or inaction by me adversely affects Lender's Security Interest in the Property, for example, (i) I transfer title to the Property or sell the Property without Lender's prior written permission; (ii) I do not maintain Required Insurance on the Property; (iii) I do not pay, when due, taxes that would become a lien on the Property; (iv) I am the only Borrower and I die; (v) I do not maintain the Property, I abandon the Property or I commit waste or otherwise destructively use the Property; (vi) a lien that is superior to Lender's Security Interest is filed against the Property, or a lien that is subordinate to Lender's lien is filed against the Property and that lien adversely effects the Property or Lender's rights in the Property; (vii) the Property is taken by condemnation or eminent domain; (viii) the Property is foreclosed upon by another lien holder; (ix) another creditor attempts to enforce a judgment against the Property; (x) I use the Property illegally such that the Property could be seized; or (xi) I move out of the Property; or

(e) One of two Borrowers dies and Lender's Security Interest is adversely affected thereby.

**(For Kansas residents only,** Lender believes the preceding events would significantly impair the prospect of payment, performance, or realization of collateral. Except for a default resulting from my failure to make any payment as required by this Agreement, the burden of establishing the prospect of such significant impairment is on the Lender.)

If I default, Lender may, subject to providing required notices and right to cure, (i) prohibit Subsequent Draws and (ii) reduce my Credit Limit and (iii) close my Account and require me to pay Lender the Total Balance right away and (iv) foreclose on my Property. If I default and Lender hires an attorney who is not Lender's employee to collect my Account, I will pay Lender's collection costs, including court costs and foreclosure costs and reasonable attorney's fees, to the extent permitted by applicable law.

All of Lender's rights and remedies shall be cumulative and nonexclusive with respect to each and every Borrower or Co-Borrower obligated under this Agreement.

**16. When Lender May Close My Account.** If I am in default, Lender may close my Account and require me to pay the Total Balance immediately, after providing me any notice of default and opportunity to cure required by applicable law. If I am in default, Lender first may choose to take other action, such as prohibiting Subsequent Draws or reducing my Credit Limit; however, unless Lender reinstates my Account, Lender does not give up Lender's right to close my Account and require me to pay Lender the Total Balance immediately, even if I do not default again. If Lender closes my Account and requires me to pay Lender the Total Balance right away, I must pay the Total Balance I owe Lender immediately. Until I pay Lender in full, the Principal Balance will continue to accrue finance charges at the rate disclosed in this Agreement, or the maximum rate allowed by applicable law, whichever is less.

**17. Closing My Account.** Except as otherwise provided in this Agreement, I may close my Account at any time by calling Lender at Lender's Telephone Number and sending a written request to Lender's Address. Lender will close my Account when Lender receives my notice. If more than one person signs this Agreement as a Borrower, any Borrowers request to close the Account will be treated as a request to close this Account by all Borrowers. Lender may not honor any Check Lender receives after Lender receives my notice. If I close my Account, I must stop using it immediately and pay the Total Balance I owe Lender. Until I pay Lender in full, Lender will charge finance charges on the Principal Balance of my Account.

**18. Credit Information.** I must notify Lender immediately if there is any adverse change in my credit or financial condition. I will provide Lender with updated financial or credit information when Lender requests it. Lender may get consumer reports from consumer reporting agencies when Lender reviews my Account.

**19. Notices.** Lender will send me any notice required by this Agreement or by law to Borrower's Address. I will tell Lender in writing if Borrower's Address changes. If Lender mails me a letter, notice, or statement to Borrower's Address, Lender can assume that I have received it. If I send Lender a notice or letter, I must send it to Lender's Address or any other address Lender specifies in my Monthly Statement.

**20. Tax Deductions.** Lender has made no promises to me nor advised me in any way whether the Finance Charges and Fees are "interest" that I may deduct on my tax returns. I should consult a tax advisor about deducting Finance Charges and Fees on my tax returns.

**21. No Transfer.** I will not transfer or assign any of my rights under this Agreement. Lender may transfer or assign any or all of Lender's rights under this Agreement.

**22. Telephone Calls.** Lender may listen to or record Lender's telephone calls with me for quality control purposes. Lender may use and I consent to the use of automated telephone equipment or prerecorded telephone calls to contact me about my Account, to the extent allowed by law. If I have a telephone answering device, Lender may leave messages about my Account or about additional opportunities and promotions on this device.

**23. No Waiver.** Lender may choose to delay enforcing any of Lender's rights or waive any of Lender's rights under this Agreement. Lender may delay enforcing or waiving any of Lender's rights without affecting Lender's other rights. If Lender waives a right, Lender can still enforce the same right later.

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT (cont)

**24. Lender's Errors.** Lender does not intend to charge or collect any interest, charge, or fee that is more than the law allows. If Lender charges or collects any amount over what the law allows, Lender will apply the excess amount first to the Principal Balance due on my Account as a partial prepayment without any Prepayment/Termination Fee. If I have paid my Account in full, Lender will refund any excess amount. If any part of this Agreement is finally determined to be unenforceable under any law, rule, or regulation, all other parts of this Agreement still are valid and enforceable.

**25. How Lender May Change This Agreement.** Subject to any state law requirements, Lender may change the terms of this Agreement if (a) I have already agreed to the change in this Agreement, (b) if I agree to the change in writing at the time Lender requests it, (c) if the change unequivocally will benefit me during the remaining term of this Agreement, or (d) if the change is insignificant (such as changes relating to Lender's data processing systems).

**26. Entire Agreement.** This Agreement, together with all documents executed at the same time, contain the entire agreement of the parties concerning the subject matter hereof, and no party hereto has relied upon any representations except such as are specifically set forth herein.

**27. Broker Representations.** Borrower acknowledges that any broker involved in the transaction is not Lender's agent, and Lender is not bound by any of the brokers representations.

**28. Release of Security.** Lender is not obligated to release the Security Instrument on the Property unless there are no longer any amounts owing to Lender under this Agreement and unless I indicate to Lender in writing that I want to terminate my Account.

**29. Not applicable.**

**30. Not applicable.**

**31. Miscellaneous.** I waive the defenses of presentment, notice of dishonor, and protest, if any, to the enforcement of this Agreement and any Security Instrument. Time is of the essence of this Agreement. If any provision of this Agreement shall be adjudged or deemed invalid, illegal, or unenforceable, such provision shall be deemed stricken from this Agreement and the remainder of the Agreement shall be construed as if such provision had never been included. Plural words shall be construed in the singular and singular words in the plural as their context may require, or as required to give effect to the terms of the Agreement. I agree to cooperate in executing any extension or statement of maturity of the Security Instrument securing this Agreement.

**32. Arbitration Agreement and Waiver of Jury Trial. (See following pages).**

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

The following notice applies if the proceeds of this loan will be applied in whole or substantial part to a purchase of goods from a seller who either refers consumers to the lender or who is affiliated with the lender by common control, contract, or business arrangement:

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT (7-8)
ARBITRATION AGREEMENT AND WAIVER OF JURY TRIAL

**DESCRIPTION OF ARBITRATION.** Arbitration is a method of resolving claims and disputes between parties without having to file a lawsuit in court. It is a process in which both sides present their case to a neutral third person--the arbitrator--instead of a judge or jury, to resolve the dispute. **TO THE FULLEST EXTENT PERMITTED BY LAW, BY SIGNING THIS AGREEMENT, BOTH LENDER AND I ARE VOLUNTARILY WAIVING ANY RIGHT TO A JURY TRIAL OR JUDGE TRIAL OF ALL CLAIMS AND DISPUTES COVERED BY THIS ARBITRATION AGREEMENT ("this Arbitration Agreement").**

**CLAIMS AND DISPUTES COVERED.** Except for those claims mentioned below under the heading "MATTERS NOT COVERED BY ARBITRATION," Lender and I agree that either party may elect to resolve by BINDING ARBITRATION all claims and disputes between us ("Covered Claims"). This includes, but is not limited to, all claims and disputes arising out of, in connection with, or relating to:

> My loan from Lender today; any previous loan from Lender and any previous retail credit agreement ("Retail Contract") whether open or closed-end, assigned to Lender; all documents, promotions, advertising, actions, or omissions relating to this or any previous loan or Retail Contract made by or assigned to Lender; any insurance product, service contract, or warranty purchased in connection with this or any previous loan or Retail Contract made by or assigned to Lender; any product or service offered to Lender's customers with any assistance or involvement by Lender; whether the claim or dispute must be arbitrated; the validity and enforceability of this Arbitration Agreement and the Agreement, my understanding of them, or any defenses as to the validity and enforceability of the Agreement and this Arbitration Agreement; any negotiations between Lender and me; the closing, servicing, collecting, or enforcement of any transaction covered by this Agreement; any allegation of fraud or misrepresentation; any claim based on or arising under any federal, state, or local law, statute, regulation, ordinance, or rule; any claim based on state or federal property laws; any claim based on the improper disclosure of any information protected under state or federal consumer privacy laws; any claim or dispute based on any alleged tort (wrong), including intentional torts; and any claim for injunctive, declaratory, or equitable relief.

**COVERED CLAIMS AGAINST THIRD PARTIES.** This Arbitration Agreement also covers any claim or dispute between me and any of Lender's employees, officers, agents, or directors; any of its affiliate corporations; any entities which provided insurance in connection with this or any previous transactions between me and Lender, any third parties that assigned Retail Contracts or other agreements to Lender; and any of the employees, officers, agents, or directors of such affiliates or third parties. Affiliate corporations are Lender's parent corporations, subsidiary corporations, and sister corporations. Some of Lender's affiliates are American General Finance Corporation, American General Financial Services, Inc., Merit Life Insurance Co., and Yosemite Insurance Company. In addition, if Lender becomes a party in any lawsuit that I have with any third party, whether through intervention by Lender or by motion made by me or any third party, all claims in that lawsuit between me and the third party will be subject to binding arbitration under this Agreement, provided that the third party is required to agree to resolve such claims by arbitration.

**MATTERS NOT COVERED BY ARBITRATION.** I agree that Lender does not have to initiate arbitration before exercising lawful self-help remedies or judicial remedies of garnishment, repossession, replevin, or foreclosure, but instead may proceed in court for those judicial remedies (an "Excluded Collateral Lawsuit"). I may assert in court any defenses I may have to Lender's claims in such a lawsuit, but any claim or counter claim for rescission or damages I may have arising out of, relating to, or in connection with Lender's exercise of those remedies must be arbitrated. Instead of pursuing arbitration, either Lender or I also have the option to bring a lawsuit in court to seek to recover an amount which does not exceed the total sum of $5,000.00 (including costs and attorneys' fees), provided that no relief other than such recovery is requested in such lawsuit (an "Excluded Damages Lawsuit"). If an Excluded Damages Lawsuit is filed, the other party cannot require that the claims in that lawsuit be arbitrated. An Excluded Damages Lawsuit can be brought to recover money for myself or Lender only, not for any class or group of persons having similar claims. If such an Excluded Damages Lawsuit is filed by me or Lender, and any party to that lawsuit files an amendment, counterclaim, cross-claim, or third-party claim seeking to recover more than $5,000, then that claim, counterclaim, cross-claim, or third party claim must be arbitrated in accordance with the procedures set forth in this Arbitration Agreement. Neither I nor Lender shall be deemed to have waived any arbitration rights by the fact of having exercised any self-help or judicial remedies of garnishment, repossession, replevin, or foreclosure or by having filed any claims in court seeking to recover a total sum of $5,000.00 or less.

## ARBITRATION RULES AND PROCEDURES.

**A.   ARBITRATION FORUM AND RULES.** The arbitration will be conducted under the rules and procedures of the National Arbitration Forum ("NAF") that are in effect at the time arbitration is started under the rules set forth in this Arbitration Agreement. At my request, Lender will provide me a copy of the NAF Rules. If I lose my copy, Lender will give me another one if I ask for it. I may also obtain a copy of those rules by calling NAF at 1-800-474-2371 or by reviewing NAF's web-site at www.arb-forum.com. In the event that NAF is either unable, unwilling, or deemed not appropriate by a court to resolve a Covered Claim, or I object to the NAF for good cause, then Lender and I agree to submit all disputes to the American Arbitration Association ("AAA") for proceedings conducted pursuant to the AAA's Commercial Rules and Expedited Procedures. In the event that AAA is either unable, unwilling, or deemed not appropriate by a court to resolve a Covered Claim, or I object to the AAA for good cause, then Lender and I agree to submit all disputes to JAMS for proceedings conducted under its Financial Services Arbitration Rules and Procedures. If there is a conflict between the rules of the NAF (or the AAA or JAMS) and this Arbitration Agreement, this Arbitration Agreement will govern.

**B.   SELECTION OF ARBITRATOR.** NAF maintains lists of approved arbitrators. NAF will provide Lender and me each a list of seven (7) possible arbitrators. Lender and I will each have an opportunity to strike three (3) persons from that list. I will make the first strike, and Lender and I will alternate in making strikes after that. After the last strike, the remaining person shall then serve as arbitrator.

**C.   STARTING ARBITRATION.** Before I start arbitration, I agree to write to Lender at the address shown for Lender in this Agreement, unless I have received notice of a new address for Lender, and I agree to give Lender a reasonable opportunity to respond and resolve any errors. In my letter, I will give the following information: my name and account number, a description of my claim or dispute and why I believe Lender has made an error, the dollar amount of my claim or dispute, and a description of any other information I need from Lender. Before Lender starts an arbitration, it must write to me at my billing address; describe its claim or dispute; state the dollar amount of its claim or dispute; and give me a reasonable opportunity to resolve the claim or dispute. If a Covered Claim cannot be resolved in the foregoing manner, either Lender or I can start arbitration. Except as described in Paragraph E below, nothing in this Arbitration Agreement shall limit the arbitrator's ability to enforce any of my rights or impose any remedies available to me under any applicable consumer protection laws or regulations. To start an arbitration, Lender and I agree to follow the rules of the NAF (or, if applicable, the rules of the AAA or JAMS).

**D.   COSTS OF ARBITRATION.** The NAF, AAA, and JAMS all charge certain fees in connection with arbitration proceedings they conduct. I may have to bear some of these fees; however, if I am not able to pay such fees or think they are too high, Lender will consider any reasonable request to bear the cost. Lender will also bear any costs Lender is required to bear by law or the terms of any other agreement with me. Each party will also pay for its own costs, including fees for attorneys, experts, and witnesses, unless otherwise provided by law or by the terms of any other agreement between the parties, to the extent permitted by applicable law.

**E.   CONDUCT OF PROCEEDINGS.** In conducting the arbitration proceedings, the arbitrator shall be bound by the Federal Rules of Evidence; however, the federal or any state rules of procedure or discovery shall not bind the arbitrator. The arbitrator's findings, reasoning, decision, and award shall be set forth in writing and shall be based upon and be consistent with the law of the jurisdiction that applies to the loan or other agreement between Lender and me. The arbitrator must abide by all applicable laws protecting the attorney-client privilege, the attorney work product doctrine, or any other applicable privileges.

**SEE REVERSE SIDE FOR ADDITIONAL ARBITRATION TERMS**

UNXR11 (1-13-02) HELOC Agreement (7-8)          Page 7          Borrower's Initials

## ARBITRATION AGREEMENT AND WAIVER OF JURY TRIAL (con't)

**F.   ENFORCEMENT AND APPEAL OF DECISION.** The decision and judgment of the arbitrator shall be final, binding, and enforceable in any court having jurisdiction over the parties and the dispute; however, for Covered Claims involving more than $100,000, any party may appeal the award, at its own cost, except as provided by law, to a three-arbitrator panel appointed by the NAF, AAA, or JAMS, as the case may be. That panel will reconsider from the start any aspect of the initial award that either party asserts was incorrectly decided. The decision of the panel shall be by majority vote and shall be final and binding, except as provided below. The arbitrator's (or panel's) findings, decision, and award shall be subject to judicial review on the grounds set forth in 9 U.S.C. § 10, as well as on the grounds that the findings, decision, and award are manifestly inconsistent with the terms of this Arbitration Agreement and any applicable laws or rules.

**G.   LIMITATION OF PROCEEDINGS.** Lender and I further agree that the arbitrator will be restricted to resolving only the claims, disputes, or controversies between Lender and me and the other parties covered by this particular Agreement (and not by similar agreements). Arbitration is not available and shall not be conducted on a class-wide basis or consolidated with other claims or demands of other persons. I agree not to participate in a representative capacity or as a member of any class of claimants pertaining to any Covered Claim.

**H.   LIMITATION OF ARBITRATOR'S AUTHORITY:** The arbitrator may award punitive damages only under circumstances where a court of competent jurisdiction could award such damages. In awarding any punitive damages, the arbitrator must abide by all applicable state and federal laws regarding the amount of such damages, and the arbitrator must state the precise amount of the punitive damages award. The arbitrator must also conduct a post-award review of any punitive damages, allowing the parties the same procedural rights and using the same standards and guidelines that would apply in a judicial proceeding in the state where the arbitration is conducted. The arbitrator may award injunctive relief that would benefit either Lender or me in connection with resolving a Covered Claim between Lender and me, but the arbitrator may not award injunctive relief for the benefit of other persons or groups of persons who are not named parties to the arbitration proceeding.

**I.   LOCATION OF THE ARBITRATION.** The arbitration will take place in the county where I live unless Lender and I agree to another location. If Lender and I agree, all or a portion of the arbitration proceedings can be conducted by telephone conference.

**J.   ENFORCEMENT IN COURT.** Nothing in this Arbitration Agreement shall prevent either Lender or me from enforcing all rights under this Arbitration Agreement if a Covered Claim is filed in court.

**K.   FORUM SELECTION CLAUSE.** If either Lender or I need to file a lawsuit to enforce this Arbitration Agreement or to pursue claims that either may or may not be arbitratable under this Arbitration Agreement, the exclusive venue for that suit will be a state court located in the county where Lender's office is located or where I sign this Agreement, or in the federal court covering that county, unless the governing law requires suit to be filed in another location. Nothing in this paragraph shall prevent either Lender or me from enforcing its or my rights under this Arbitration Agreement if the Covered Claim is filed in court.

**ADDITIONAL INFORMATION.** I may obtain additional information about arbitration by contacting the National Arbitration Forum, Inc., at P.O. Box 50191, Minneapolis, Minnesota 55405. (800-474-2371 (Telephone)). (612-631-0802 (Fax)). www.arb-forum.com (e-mail).

**OTHER IMPORTANT AGREEMENTS.** Lender and I agree:

(a)   This Arbitration Agreement does not affect any statute of limitations or claims of privilege recognized at law.

(b)   The loan and insurance transactions between Lender and me and other applicable parties are transactions involving interstate commerce, using funds and other resources from outside the state.

(c)   The Federal Arbitration Act applies to and governs this Agreement. State arbitration laws and procedures shall not apply to this Agreement.

(d)   This Agreement applies to and runs to the benefit of Lender's and my assigns, successors, executors, heirs, and/or representatives.

(e)   If any term of this Arbitration Agreement is unenforceable, the remaining terms are severable and enforceable to the fullest extent permitted by law.

(f)   This Arbitration Agreement supersedes any prior arbitration agreement that may exist between Lender and me and can only be modified in writing signed by the parties.

(g)   This Arbitration Agreement applies even if my loan has been cancelled, changed, modified, refinanced, paid in full, charged off, or discharged or modified in bankruptcy.

I AGREE TO READ THIS ARBITRATION AGREEMENT CAREFULLY, BECAUSE IT LIMITS CERTAIN OF MY RIGHTS, TO THE EXTENT PERMITTED BY LAW, INCLUDING MY RIGHTS TO BRING A COURT ACTION, TO HAVE A TRIAL BY JURY, AND TO PARTICIPATE IN A CLASS ACTION OR CLASS ARBITRATION. BY SIGNING THIS AGREEMENT, I ACKNOWLEDGE THAT I HAVE READ AND RECEIVED A COPY OF THIS ARBITRATION AGREEMENT AND AGREE TO BE BOUND BY ALL OF ITS TERMS.

SEE FOLLOWING PAGE FOR ADDITIONAL INFORMATION

**33. Prepayment/Termination Fee.**

[X] If checked and if (i) I pay the Total Balance on my Account within __60__ months after the Date of Agreement and (ii) I terminate my Account, I agree to pay a prepayment/termination fee equal to __2.0__ % of the amount of my original Credit Limit ("Prepayment/Termination Fee"). There will be no Prepayment/Termination Fee if (a) my Account is refinanced or consolidated by Lender or its affiliate; (b) my Account is prepaid with insurance proceeds; (c) my Account is prepaid as a result of lawsuit, foreclosure, or acceleration; (d) Lender disapproves a request for assumption and exercises its rights under a due on sale clause, and imposition of the Prepayment/Termination Fee is prohibited by applicable law; or (e) my Account is terminated more than __60__ months after the Date of Agreement.

[ ] If checked, there will be no Prepayment/Termination fee.

**34. Late Fee.** If I fail to pay in full the Current Payment within __9__ days after the Payment Due Date, Lender may charge a Late Fee equal to __5.00__ % of the unpaid installment.

**35. Returned Check Fee.** If my check or other instrument given to Lender is returned unpaid for any reason, I agree to pay a dishonored check charge of $ __25.00__.

**36. Reconveyance Fee.** Not applicable.

**37. Due on Sale.** If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument; however, this option shall not be exercised if the exercise of this option by Lender is prohibited by federal law as of the date of the Security Instrument.

If Lender exercises this option, Lender will give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on me.

**38. Governing Law.** The laws of the state where the Property is located and federal law govern this Agreement.

SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION

AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT (con't)

IF I DEFAULT AND THIS LOAN IS SECURED BY A DEED OF TRUST ON MY HOME, I MAY LOSE MY HOME.

BY SIGNING BELOW, I SIGNIFY THAT I HAVE READ, UNDERSTOOD, AND AGREED TO THE TERMS AND CONDITIONS OF THIS AGREEMENT, INCLUDING THE ARBITRATION AGREEMENT THAT PROVIDES, AMONG OTHER THINGS, THAT EITHER LENDER OR I MAY REQUIRE THAT CERTAIN DISPUTES BETWEEN US BE SUBMITTED TO BINDING ARBITRATION. IF LENDER OR I ELECT TO USE ARBITRATION, WE AGREE THAT WE WILL HAVE THEREBY WAIVED OUR RIGHTS TO TRIAL BY JURY OR JUDGE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THAT THE DISPUTE WILL BE DECIDED BY AN ARBITRATOR, AND THAT THE DECISION OF THE ARBITRATOR WILL BE FINAL. ARBITRATION WILL BE CONDUCTED PURSUANT TO THE RULES OF THE NATIONAL ARBITRATION FORUM, EXCEPT AS OTHERWISE PROVIDED IN THE ARBITRATION AGREEMENT.                                                                                UNARBT (8-12-01)

I agree that, as of the date first written above ("the Date of Agreement"), I have received and read a fully completed, legible copy of this Agreement, the Truth in Lending Insurance Disclosures, a copy of the Security Instrument, the Privacy Notice, and two copies of a Notice of Right to Cancel (if applicable), and agree to be bound thereby.

CAUTION:  IT IS IMPORTANT THAT I THOROUGHLY READ THE CONTRACT BEFORE I SIGN IT.

x _____          x _____  L.S.
Witness                               Borrower    DENISE L SERKEDAKIS

x _____          x _____  L.S.
Witness                               Co-Borrower  WILLIAM C SERKEDAKIS

                                    x _____  L.S.
                                      Co-Maker
                                      Print Name: _____

                                    x _____  L.S.
                                      Co-Maker
                                      Print Name: _____

## NOTE ALLONGE

THIS ENDORSEMENT IS INCORPORATED INTO AND SHALL BE DEEMED PART
OF THE NOTE TO WHICH IT IS ATTACHED.

| | |
|---|---|
| Borrower 1: | DENISE L SERKEDAKIS |
| Borrower 2: | |
| Date of Loan: | 7/25/2003 |
| Loan Amount: | $140,000.00 |
| Property Address: | 3629 LAKESHORE DR |
| City, State, Zip: | SMYRNA, GA 30082 |

*Pay to the order of:*

Without recourse

Springleaf Financial Services, Inc. FKA AMERICAN GENERAL FINANCIAL SERVICES,
INC. (DE)

Stephen L. Day
Vice President